**GARRETT et al. v. FAUST et al.**

No. 10128.

United States Court of Appeals
Third Circuit.

Argued May 4, 1950.

Decided August 1, 1950.
Rehearing Denied Sept. 14, 1950.

Cornelius C. O'Brien, Philadelphia, Pa., for appellant.

Arthur H. Bartelt, Austin, Tex., Charles W. Eaby, Lancaster, Pa., for appellee.

Before MARIS, GOODRICH and HASTIE, Circuit Judges.

MARIS, Circuit Judge.

John C. Faust and Cora Faust, his wife, two of the defendants in a civil action brought by T. A. Garrett and Elizabeth Garrett, his wife, in the District Court for the Eastern District of Pennsylvania, have appealed from a judgment entered against them upon the verdict of a jury in the amount of $17,000.00. The jury rendered a verdict in favor of a third defendant, Railway Express Agency, Incorporated, by direction of the court and it is not involved in this appeal. Motions by the Fausts for a new trial and for judgment n. o. v. were denied. 9 F.R.D. 482.

Mr. and Mrs. Garrett reside in Richland Springs, Texas and are there engaged in the business of raising turkeys and selling turkey eggs for hatching purposes. Mr. and Mrs. Faust reside in Ephrata, Pennsylvania, where they are engaged in the business of hatching turkey and chicken eggs and selling the poults and chicks to turkey and chicken growers. The business, which is carried on under the name "Ephrata Hatcheries", is owned by Mrs. Faust and managed by Faust.

The season during which turkey eggs are hatched runs from mid-December to about June. During the 1944–1945 season the Ephrata Hatcheries had purchased turkey eggs for hatching from the Garretts. On August 30, 1945 Faust wrote the Garretts a letter offering to purchase all their turkey eggs for the next season commencing December 15, 1945. A schedule of prices was proposed and the letter stated: "There will be no change in the price of eggs unless we are compelled to sell our poults for less than 60¢, or any change due to conditions beyond our control." This offer was accepted by Garrett in a letter of September 5, 1945.

On December 4, 1945 Faust wrote Garrett a letter in which he stated that "Due to the drop in turkey market and the demand for poults way below last year" he was compelled to reduce the price which he would pay for eggs to the figures set out in the letter. To this letter the Garretts replied under date of December 14, 1945 stating: "Your letter of Dec. 4 to hand. Will say in reply that we will accept the reduced price in eggs although the feed is higher than last year and turkey market about as good as last season." Following this modification of the contract the Garretts proceeded to ship turkey eggs produced by them to the Ephrata Hatcheries. On January 28, 1946 Faust sent them a letter in which he placed them on a reduced quota of not more than 10 cases of Broadbreast Bronze turkey eggs per week, effective at once. The quota was not to apply to eggs of the White Holland and Narragansett breeds, a small quantity of which the Garretts also produced. The reason given by Faust for this action was that poults were not moving early in the most eastern states due to the shortage of feed and he was, therefore, going to hatch only 50% of capacity for the balance of the season. He also stated that the price would drop 2 cents per egg and that if they could sell elsewhere it would be all right. He advised selling at once all breeders they did not need. To this letter Garrett replied under date of February 3d, the following being pertinent excerpts from his reply:

"Your letter of Feb. [sic] 28th came a day or two ago. It is quite a blow to us, but we have run a Hatchery for fifteen

years, and we know when you cannot sell chicks or Poults, you cannot keep buying eggs.

"So we are selling 1500 of our Broad brest, which only leaves 500, which should produce about 10 cases per week.

"Now we have 300 Narraganzets, and 100 White Holland, that we would like to keep, if it meets with your approval.

*   *   *

"Now we would like to know Definitely, if you can take the eggs from these, and the 500 Broad breast, if it is possible for you to say, at this time.

*   *   *

"I believe there is going to be about 80% of the Turkeys sold over the country, so eggs may be scarce before the season is over.

"The trucks are comeing for 1000 hens and 125 toms Tuesday, and the rest Thursday, so we would like to hear from you by Wednesday night, so if you can wire me Wed. evening, stateing your wishes, please do so, if I dont hear from you by then, I will call you Wed. evening late.

"We are selling a little over two thirds of our flock, which should easily take care of the surplus, if everyone will do that."

A few days later Garrett telephoned Faust who agreed to take the Broadbreast eggs which he had on hand and to continue to take his Narragansett and White Holland eggs. This was done for a few weeks after which further shipments were discontinued, as a result of a telegram from Faust on February 21st notifying the Garretts that "Due to conditions beyond our control, cancellations by the thousands, I cannot take any more eggs this season. Stop all egg shipments at once." The Garretts acquiesced in this termination of the contract but subsequently a controversy arose as to whether the eggs actually delivered had been paid for in full.

Although the complaint is inartificially drawn it appears that the plaintiffs are asserting two different claims, (1) for damages to compensate them for the loss of profits which they suffered by reason of alleged fraudulent misrepresentations by Faust which induced them to agree to the modification and ultimate termination of the contract, and (2) for the unpaid balance of the purchase price of the eggs which were actually sold and delivered. We consider first the claim based upon the alleged fraudulent misrepresentations.

The misrepresentations relied upon appear to be three. The first is contained in Faust's letter to Garrett of December 4, 1945 in which he stated that he was compelled to reduce the price of eggs "Due to the drop in turkey market and the demand for poults way below last year." In the same letter Faust stated that he must sell poults for at least 10 cents less than the last year's prices to get bookings and that he had an order of 60,000 poults that would only book at 15 cents under last year's prices. The next statement relied upon as a misrepresentation is the statement contained in the letter of January 28, 1946 that "Poults are not moving early in the most eastern states, due to the shortage of feed." The third and only other statement relied on appears in the telegram of February 21, 1946 that "Due to conditions beyond our control, cancellations by the thousands, I cannot take any more eggs this season." This was amplified somewhat in a letter written on the same day by Faust to N. B. Garrett, a son of the plaintiffs who was also in the turkey raising business, which contained the following statements:

"Our wire to you stated reason for stopping egg shipments. It is with greatest regret that I am stopping egg shipments, but under the circumstances, it is all I can do. I have over 60,000 poults for sale March 4th, 11th and 18th. As I stated, if you could use poults now, I would take one egg for each 2 poults sold. Prices are 60¢ each f.o.b. hatchery, shipped by Air Express.

"Each day we receive cancellations of poults. One reason only, shortage of feed. The turkey raisers around here all made money last year, but they are not able to buy feed."

A careful study of the record satisfies us that the plaintiffs wholly failed to produce evidence that any of the foregoing statements by Faust were untrue, let alone fraudulent. It will be seen that all these statements were to the general effect that

the demand for turkey poults in December, 1945, and January and February, 1946 had fallen off from what it had been the previous year and that this was the result of a shortage in feed by reason of which turkey raisers were not buying poults in as great numbers as formerly. There is not a scintilla of evidence in the record tending to indicate that the feed shortage to which Faust referred did not in fact exist at that time. On the contrary the Garretts in a letter to Faust dated February 2, 1946 themselves recognized the existence of this shortage, stating: "I think this situation is due strictly to many turkey hens being kept for laying. And of course shortage of feed." Nor is there any evidence that in December 1945 and January and February 1946 the prospects of the Ephrata Hatcheries for the sale of poults were not as represented in the statements referred to. On the contrary the defendants' books of account which were offered in evidence by the plaintiffs establish that they had in fact received cancellations of orders for thousands of poults during this period.

The plaintiffs, apparently recognizing this failure in their proof, moved the court at the close of the testimony to amend their complaint in accordance with the proof and stated their position "as contending that the complaint avers that there is a breach of contract, and that we rely on that breach of contract for our case, on the question of misrepresentation." The court granted this motion over the objections of the defendants who pleaded surprise and moved for the withdrawal of a juror. Since the plaintiffs' motion was not followed up by a specific amendment of the complaint it is difficult to understand just what was intended by it. It is certainly true that the plaintiffs relied upon a breach of contract in the sense that the defendants had failed to pay in full in accordance with the contract for the eggs which had been delivered. It is equally clear that the evidence did not establish any other breach of contract but indicated on the contrary that the plaintiffs acquiesced in the modification and later cancellation of the contract, the whole theory of their case being that this action on their part was induced by the fraudulent misrepresentations of Faust.

■ It is not entirely clear upon which theory this branch of the case was submitted to the jury. Although the trial judge referred in his charge to breach of contract nonetheless he affirmed the defendants' seventh point for charge which instructed the jury that it must find all the elements of fraud to be present in order for the plaintiffs to recover. We need not resolve this question, however, since, as we have said, the evidence wholly fails to establish either fraudulent misrepresentations by the defendants or a breach of contract by them other than that involved in the failure to pay in full for the eggs actually shipped to them by the plaintiffs. The defendants were accordingly entitled to a directed verdict in their favor on this branch of the case.

■ We turn then to consider the plaintiffs' claim relating to the purchase price of eggs alleged to have been delivered but not paid for. The evidence upon this subject was extremely confusing and unsatisfactory, the books of account of the plaintiffs and the defendants not being in agreement and Garrett's testimony being in disagreement with both. There was, however, unquestionably evidence from which the jury could find that eggs had been delivered by the plaintiffs to the Ephrata Hatcheries which met the requirements of the contract but had not been paid for in full. In view of the conflicting evidence the amount due on this account was peculiarly a question for the jury and we are not impressed with the defendants' argument that this question was not properly submitted by the trial judge in his charge. Moreover the trial judge very properly submitted interrogatories to the jury upon this branch of the case. These interrogatories, three in number, were as follows:

"1. Did the plaintiffs ship any eggs at all in the 1945–1946 season to defendants which defendants accepted but did not pay for?

"2. If so, were these eggs in satisfactory shape within the conditions of the agreement of the parties?

"3. If so, what do defendants still owe to plaintiffs for those eggs?"

The jury answered interrogatories 1 and 2 in the affirmative and in answer to interrogatory 3 fixed the amount owing for the eggs in question at $3,609.10.

The trial judge also submitted interrogatories to the jury with respect to the claim for damages resulting from the alleged breach of contract or fraudulent misrepresentations. It appears from the answers to these latter interrogatories that the jury computed the plaintiffs' damages on this branch of the case at $13,390.90, which with the sum of $3,609.10 awarded for the eggs delivered made up the total verdict of $17,000.00 awarded to the plaintiffs against the defendants. From what has been said it follows that $13,390.90, the portion of the verdict which represents damages awarded for either breach of the contract or fraudulent misrepresentations, cannot stand, there being no evidence to support liability on either score. However, the balance of the verdict, amounting to $3,609.10, being clearly identifiable as representing the jury's determination of the amount due by the defendants to the plaintiffs for the purchase price of eggs sold and delivered does have a sufficient basis in the evidence. There is accordingly no reason why that portion of the verdict should not stand. Under the circumstances we will exercise our power to direct that the amount of the judgment be reduced to that figure. 28 U.S.C.A. § 2106; Insurance Company v. Piaggio, 1872, 16 Wall. 378, 83 U.S. 378, 21 L.Ed. 358; New York, Lake Erie & Western Railroad Co. v. Estill, 1893, 147 U.S. 591, 13 S.Ct. 444, 37 L.Ed. 292; Thorpe v. National City Bank, 5 Cir., 1921, 274 F. 200.

The defendants urge that certain trial errors require reversal of the entire judgment and the granting of a new trial. One is that a juror should have been withdrawn upon the defendants' motion because counsel for the plaintiffs in his opening statement to the jury mentioned the amount of damages claimed in the complaint. It is true that this is a ground for a mistrial in the state courts in Pennsylvania and that in Vaughan v. Magee, 3 Cir., 1914, 218 F. 630, this court applied the same rule to a trial in the court below. We think, however, that this is purely a matter of procedure as to which in 1914 the district courts in diversity cases were required by the Conformity Act to follow the state rule but as to which since the repeal of that act the federal courts apply their own rule. Smith v. Philadelphia Transp. Co., 3 Cir., 1949, 173 F.2d 721, 726. Here the trial judge made it perfectly clear to the jury that they were to disregard this inadvertent statement and we think that the incident did not involve reversible error.

The defendants also urge that the trial judge erred in his charge to the jury and in failing to charge certain of the defendants' requests. We see no merit in these contentions. It is true that the trial judge inadvertently failed to state to the jury certain of the defendants' points for charge which he had affirmed but since all these points related to the plaintiffs' claim for damages as to which the defendants were entitled to a directed verdict the inadvertent omission did the defendants no ultimate harm.

The defendants complain that the trial judge took over and conducted a large part of the examination of Garrett as a witness. Counsel for the plaintiffs was obviously unfamiliar with trial practice in the district court. It is clear that the action of the trial judge in this connection was undertaken in an effort to assist in the orderly development of the facts of the case. It was unquestionably within his discretionary power to do so.

Finally Mrs. Faust urges that she was entitled to a directed verdict because she was not mentioned in the testimony as an actor. The contention is wholly without merit. The testimony is uncontradicted that Mrs. Faust was the owner of the business which Faust managed as her employee. As owner she received the eggs which Faust purchased on her behalf from the plaintiffs and she is, therefore, liable to

pay for them under the contract which Faust made as her manager.

The judgment of the district court in favor of the plaintiffs will be vacated and the cause will be remanded with directions to enter judgment for the plaintiffs and against the defendants, John C. Faust and Cora Faust, in the sum of $3,609.10.