**Rose C. ROTONDO, Executrix of the Estate of Louis J. Rotondo, Deceased, and Rose C. Rotondo, in Her Own Right**

v.

**KEENE CORPORATION.**

No. 91–1648.

United States Court of Appeals, Third Circuit.

Submitted Under Third Circuit Rule 12(6) January 30, 1992.

Decided Feb. 11, 1992.

---

Ronald E. Hurst, Montgomery, McCracken, Walker & Rhoads, Philadelphia, Pa., for appellant.

Michael B. Leh, Martin Greitzer, Greitzer & Locks, Philadelphia, Pa., for appellee.

Before SLOVITER, Chief Judge, MANSMANN and HUTCHINSON, Circuit Judges.

## OPINION OF THE COURT

SLOVITER, Chief Judge.

On this appeal defendant Keene Corporation argues that the plaintiff, Rose Rotondo (in her own right and as executrix of the estate of her husband, Louis Rotondo), produced insufficient evidence to support the jury's verdict that Louis Rotondo's death was caused by his inhalation of asbestos fibers shed from a product manufactured by Keene's predecessor, Ehret Magnesia Company.

### I.

#### Procedural History

In 1987 Louis Rotondo (Rotondo) and his wife filed this action against Keene and several manufacturers of asbestos-containing products. On August 23, 1988, Rotondo died of mesothelioma, a cancer caused exclusively by inhalation of asbestos fibers. It is undisputed that Rotondo contracted mesothelioma as a result his exposure to asbestos fibers. It is also undisputed that Ehret manufactured pipecovering containing 15% asbestos. Prior to trial, all of the other defendants either filed for reorganization under the bankruptcy laws (Celotex Corporation, Raymark Industries, Inc., Eagle–Picher Industries, Inc.) or settled with the plaintiff (Garlock Corporation).

At the close of plaintiff's case, Keene moved for a directed verdict arguing that plaintiff failed to prove that Rotondo was exposed to Ehret pipecovering and that this exposure was a substantial contributing factor in causing his death, a motion Keene renewed at the close of its case. The district court denied both motions. The jury found for the plaintiff, awarding Rose Rotondo $275,000 as executrix of her husband's estate and $125,000 for loss of consortium. The jury also found in favor of Keene against the settling co-defendant Garlock on Keene's cross-claim for contribution, reducing the verdict by 50%. Upon plaintiff's motion, the court awarded Rose Rotondo $81,039.77 in delay damages pursuant to Pa.R.Civ.P. 238.

Keene filed a post-trial motion seeking j.n.o.v. or a new trial pursuant to Federal Rules of Civil Procedure 50(b) and 59 respectively. The district court denied the motion, and Keene appeals.

## II.

### Standard of Review

■ Without question the substantive products liability law of Pennsylvania applies in this diversity action. This court applies the federal standard for judging the sufficiency of the evidence in diversity actions. *See, e.g., Woods v. National Life & Acc. Ins. Co.,* 347 F.2d 760, 768 (3d Cir. 1965) (noting, in case applying state contract law, that "[t]he federal courts have their own standard for ascertaining when a verdict should be directed"); *Kinnel v. Mid–Atlantic Mausoleums, Inc,* 850 F.2d 958, 961 (3d Cir.1988) (applying, without discussion, federal sufficiency of evidence test in state law contract dispute); *see also* 5A J. Moore & J. Lucas, Moore's Federal Practice ¶ 50.06 (2d Ed. 1991) (noting that most circuits apply federal standard). We note, in any event that under both federal and Pennsylvania law, a court considering a motion for j.n.o.v. must view the evidence, together with all reasonable inferences therefrom, in the light most favorable to the verdict winner. *See Chuy v. Philadelphia Eagles Football Club,* 595 F.2d 1265, 1273 (3d Cir.1979) (in banc); *At-*

*kins v. Urban Redevelopment Auth.,* 489 Pa. 344, 414 A.2d 100, 103 (1980).

■ This court has stated that "[i]n reviewing the district court's ruling on the parties' motions for judgment n.o.v., [the appeals court] appl[ies] the same standard as the trial court." *Simone v. Golden Nugget Hotel & Casino,* 844 F.2d 1031, 1034 (3d Cir.1988). Under federal law, this court should affirm the denial of a motion j.n.o.v. "unless the record 'is critically deficient of that minimum quantum of evidence from which a jury might reasonably afford relief.'" *Dawson v. Chrysler Corp.,* 630 F.2d 950, 959 (3d Cir.1980), *cert. denied,* 450 U.S. 959, 101 S.Ct. 1418, 67 L.Ed.2d 383 (1981) (quoting *Denneny v. Siegel,* 407 F.2d 433, 439 (3d Cir.1969)). In addition, this court reviews a district court's ruling on a motion for a new trial for abuse of discretion unless the court's denial of the motion is based on the application of a legal precept, in which case the standard of review is plenary. *Link v. Mercedes–Benz of North America, Inc.,* 788 F.2d 918, 921 (3d Cir.1986).

## III.

### Relevant Facts

■ The evidence viewed in the light most favorable to the plaintiff showed that over an 18–month period during 1942–43 Rotondo worked for 6 months as a tacker and for the remainder as a welder at the Philadelphia Naval Ship Yard. Rotondo testified that he worked on the *Monticello* during the summer of 1942 for at least 3 to 4 months, a minimum of 2 days per week. Although Rotondo did not personally handle pipecovering, he testified in deposition that he spent most of his time in the ship's boiler room, working 6 to 8 feet away from the pipecoverers who placed asbestos covering on pipes. The coverers would saw sections of the covering, causing dust to be released into the air.

Although Rotondo was unable to identify the names of the manufacturers on the boxes containing the pipecovering, product identification testimony was provided by Robert Souels who worked on the *Monti-*

*cello* from the spring through the fall of 1942. During his time on the *Monticello*, Souels worked as a cleaner and rigger, spending approximately two-thirds of his time cleaning and the other third of his time on board the ship loading. As a cleaner, Souels would clean-up debris from pipecoverers in boiler rooms. Souels's testimony suggests that the boiler room on the *Monticello* was the size of the courtroom in which he was testifying. Souels testified that a lot of dust was created when the pipecoverers cut the asbestos-containing covering to fit over the pipes. The pipecovering material was in boxes three feet high labeled with the word "asbestos." Rotondo also testified that the pipecovering came from 36–inch boxes.

While working as a rigger, Souels would lower these boxes into the engine and boiler rooms. Souels stated that he saw two different names on the boxes he unloaded, Unibestos and Ehret, and he saw them with the same frequency. Moreover, Souels actually saw pipecoverers using Ehret sections on a regular basis and testified that during the periods when the pipecoverers worked with the Ehret coverings the atmosphere was "like a nice little snow storm." Souels also noted that the boiler rooms were not ventilated.

Finally, Souels made the following observations: that on all the ships that he worked, welders and tackers worked in the areas right around where the pipecoverers worked, that he worked alongside tackers, and that it would not have been possible for anyone working around the welders and tackers in these areas not to have breathed in dust from the Ehret sections.

Plaintiff offered Dr. Daniel C. DuPont as its medical expert, who testified that mesothelioma, unlike other asbestos-related diseases, is not dose-dependent, apparently because mesothelioma can result from "relatively insignificant exposure" to asbestos. App. at 90.

## IV.

### *Discussion*

Keene relies primarily on *Eckenrod v. GAF Corp.*, 375 Pa.Super. 187, 544 A.2d 50, *alloc. denied*, 520 Pa. 605, 553 A.2d 968 (1988). In *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 382 (3d Cir.1990), we predicted that the Pennsylvania Supreme Court would adopt the standard for showing causation in an asbestos products liability action set forth in *Eckenrod.* Indeed, the lower Pennsylvania courts have acknowledged *Eckenrod* as setting forth the law applicable in Pennsylvania. *See, e.g., Lilley v. Johns–Manville Corp.*, 408 Pa.Super. 83, 596 A.2d 203, 209–10 (Pa.Super.1991); *Godlewski v. Pars Mfg. Co.*, 408 Pa.Super. 425, 597 A.2d 106, 110 (Pa.Super.1991); *Samarin v. GAF Corp.*, 391 Pa.Super. 340, 571 A.2d 398, 404 (1989), *alloc. denied*, 524 Pa. 629, 574 A.2d 71 (1990).

In *Eckenrod*, the Pennsylvania Superior Court, in affirming the trial court's order granting summary judgment in favor of the defendants, stated that in order for liability to attach in a products liability action, "plaintiff must establish that the injuries were caused by a product of the particular manufacturer or supplier." 544 A.2d at 52. The court stated that "a plaintiff must establish more than the presence of asbestos in the workplace; he must prove that he worked in the vicinity of the product's use." *Id.* In particular, a plaintiff must present evidence "to show that he inhaled asbestos fibers shed by the specific manufacturer's product." *Id.* The relevant evidence is "the frequency of the use of the product and the regularity of the plaintiff's employment in proximity thereto." *Id.* at 53.

Although the *Eckenrod* plaintiff presented evidence that could establish that the defendants' products were sent to the furnace area of the plant of her husband's employer, and that plaintiff's husband worked somewhere in the vicinity of those products, the court concluded that the evidence submitted by plaintiff consisting of affidavits of three of her husband's former co-workers "did not elaborate on the nature or length of the exposure or the brand of products available." *Id.* at 52. Accordingly, the *Eckenrod* court sustained the grant

of summary judgment in favor of the defendants at issue.

In *Robertson,* this court analyzed whether the evidence produced on behalf of plaintiffs who claimed injury resulting from exposure to various asbestos-containing products used in a Firestone Tire and Rubber Company plant during their employment there met the "requisite *Eckenrod* showing of regularity, frequency, and proximity with regard to some of the defendants' products." 914 F.2d at 376. We explained that "under the strict *Eckenrod* standard, a plaintiff claiming asbestos-related injury may withstand a defendant's motion for summary judgment only in those cases in which he is able to raise a reasonable inference that he was exposed to and injured by fibers released by the particular defendant's product." *Id.*[1] We concluded, for example, that with respect to the products of defendant Eagle–Picher, the "testimony [was] insufficient to establish the specific regular use of these products required by *Eckenrod.* While several witnesses were able to place Eagle–Picher products in the plant, no witness was able to say how much of the product was used and how many times it was used in a given area." *Id.* at 378. Because the plaintiffs had submitted no evidence "that any plaintiff was exposed to or worked in the vicinity of any Eagle–Picher product on a regular basis," *id,* the *Eckenrod* standard had not been met.

Keene cites *Robertson* to support its position that the circumstantial evidence adduced in this case fails to demonstrate the regularity or frequency, if any, of Rotondo's exposure to Ehret pipecovering. Certainly *Robertson* cannot support Keene's position because in *Robertson* we concluded that some of the plaintiffs had presented enough evidence to withstand summary judgment. We noted, for example, that plaintiff Stopfel had worked in the stock-cutting areas of the Firestone facility and that his product identification witness, a maintenance mechanic at Firestone during the relevant period, identified the asbestos-containing brake linings used in the stock-cutting area as those manufactured by Allied/Bendix. Also, Stopfel's expert witness offered testimony that asbestos containing dust is released during the braking process. We held this evidence was enough to meet the *Eckenrod* standard. *Robertson,* 914 F.2d at 376–77.

Nor do we think that the other cases cited by Keene support its position that the district court's order should be reversed. In *Samarin v. GAF Corp.,* 391 Pa.Super. 340, 571 A.2d 398 (1989), *alloc. denied,* 524 Pa. 629, 574 A.2d 71 (1990), the Pennsylvania Superior Court affirmed the trial court's grant of summary judgment against plaintiffs, former Babcock & Wilcox Company (B & W) workers, who claimed they were exposed to asbestos dust released from the surrounding asbestos products, including cloth hung on furnace doors and asbestos gloves. Plaintiff Samarin submitted testimony of an employee who had worked in the purchasing department during the relevant period, and who stated that he had purchased asbestos cloth and gloves from defendant A–Best as well as from other suppliers. Another co-worker of Samarin stated that Samarin had been exposed to a heat resistant cloth, but never named the brand. A–Best admitted it sold asbestos gloves to B & W.

The court upheld the grant of summary judgment for A–Best. As to the cloth it stated "[w]e have no way of telling who supplied the cloth that Jack Samarin was actually exposed too [sic]." *Id.* 571 A.2d at 406. With respect to asbestos-containing gloves, the court noted that there was no evidence to show that Samarin used any sort of gloves, much less those supplied by A–Best, and stated, "[t]he mere fact that

---

**1.** In *Robertson* we also rejected plaintiffs' fiber drift theory which postulated that asbestos fibers from the defendants' products "could have been carried by air currents and other means to various parts of the plant where they may have been inhaled by the plaintiffs, thus contributing to the alleged asbestos-related injuries." 914 F.2d at 365. We explained that the fiber drift theory cannot stand alone: "it must be supported by evidence showing the frequency of a product's use and the regularity of the plaintiff's employment in an area into which there is a reasonable probability that the fibers drifted." *Id.* at 380.

[A–Best] gloves were supplied to B & W and present in its enormous facilities cannot be used to establish the fact that Jack Samarin used those gloves or breathed any dust that may have come off of them." *Id.* at 407.

Neither *Samarin* nor the holding of *Robertson* sustaining summary judgment for the defendants requires us to hold that the evidence here was inadequate to show the requisite proximity of Rotondo to Ehret pipecovering, the regularity of such exposure, and the frequency with which the covering was used. In both *Samarin* and the relevant portion of *Robertson*, all plaintiffs could show was that the defendants' products were supplied to a certain facility. The facilities at issue in both cases were large. In *Samarin* the court referred to the "enormous" B & W facility. In *Robertson*, we noted the vast size of the Firestone tire-manufacturing facility, which consisted of three levels covering a minimum of 862,-000 square feet of floor space.

In contrast, in this case Souels's testimony puts Ehret pipecovering in the boiler room of the *Monticello*, the same room of the same facility in which Rotondo worked. In addition, Rotondo's own testimony was that he worked within 6 to 8 feet of the pipecoverers. That amply satisfies the proximity requirement. Souels's testimony was to the effect that the pipecoverers used Ehret covering approximately 50% of the time. Keene argues nevertheless that because the pipecoverers only worked 50% of the time in the boiler and engine rooms of the *Monticello*, we cannot permit the jury to infer Rotondo's exposure. However, Rotondo himself testified that he worked in the boiler room at the same time that pipecoverers worked. It would be far more speculative to assume, as Keene apparently wants us to, that the pipecoverers used only the other brand when Rotondo was in the room than to permit the jury to

infer that they used both brands identified interchangeably.[2]

Although it is true that there was no direct evidence that Rotondo inhaled asbestos fibers shed by Ehret pipecovering, nothing in the Pennsylvania cases precludes the jury from making that inference from testimony of the nature presented here. In a recent Pennsylvania Superior Court decision also arising out of asbestos exposure while working on ships, *Lilley v. Johns–Manville Corp.*, 408 Pa.Super. 83, 596 A.2d 203 (1991), the court upheld the trial court's denial of defendant's motion for a j.n.o.v. The Superior Court explained:

> The testimony adduced at trial established that Mr. Lilley had contracted asbestosis, a disease caused only by the inhalation of asbestos fibers. Witnesses testified that Mr. Lilley worked in close quarters, that asbestos dust was omnipresent in this area, and that Caltempt (Caltherm) and other asbestos products carrying the "Pabco" trade name manufactured by [defendant] were used by Sun Ship Company during the pertinent timeframe.

*Id.* 596 A.2d at 208.

Another recent Pennsylvania case is also instructive. In *Godlewski v. Pars Mfg. Co.*, 408 Pa.Super. 425, 597 A.2d 106 (Pa.Super.1991), the Superior Court reversed the trial court's grant of defendants' motions for summary judgment. In assessing the evidence presented by one defendant, Combustion Engineering (C.E.), the court stated:

> C.E. admitted that it manufactured Stictite cement between 1963 and 1972 and that the cement contained asbestos. In addition, we note that each appellant produced an affidavit of Robert Delescavage. Those affidavits indicate that Delescavage worked at Foster–Wheeler between 1966 and 1984, that he worked with Stic-tite, that it was used to finish

**2.** Keene points to some weaknesses in Souels's testimony, such as his failure to identify Ehret in his testimony in his own lawsuit, even after he reviewed a product list, the fact that he did not know Rotondo during the time they both worked in the boiler room, and his testimony

that the pipecoverers he observed were using the product overhead on scaffolding while Rotondo testified that the pipecoverers he saw worked on a workbench. These issues go to the weight of Souels's testimony and his credibility, paradigmatic jury issues.

off walls in stress relief, around purge covers, and on furnaces, that it was mixed with water in a trough, that this activity created a large amount of dust, and that [appellants] had, at times, either worked with Stic-tite or near where it was being used.

*Id.* 597 A.2d at 110. This evidence was sufficient "to conclude that the three appellants demonstrated the exposure necessary to defeat C.E.'s motions." *Id.* Although *Godlewski* arose on summary judgment and this case involves j.n.o .v., its precedential strength is not weakened thereby, inasmuch as the standard for granting summary judgment "mirrors the standard for a directed verdict." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). *Cf. Fireman's Fund Ins. Co. v. Videfreeze Corp.,* 540 F.2d 1171, 1177 & n. 5 (3d Cir.1976), *cert. denied,* 429 U.S. 1053, 97 S.Ct. 767, 50 L.Ed.2d 770 (1977).

Keene argues that there was evidence in *Godlewski* that the plaintiff had worked either with Stic-tite or near where it was being used. Although Souels was not able to provide such testimony about Rotondo, his testimony together with Rotondo's was comparable to that found sufficient in *Godlewski.* In addition the testimony was similar to that which we held sufficient as to plaintiff Stopfel in *Robertson* ("there is record evidence that Allied/Bendix brake linings were used frequently on the two Spadone cutters in the stock-cutting area and that Stopfel worked in proximity to these cutters over a seven year period." 914 F.2d at 376). *See also Harrell v. Fibreboard Corp.,* Nos. 85–4604, 5655, 6873, and 86–2118, 2304, 3112, 1989 WL 145810, at *3 (E.D.Pa. Nov. 27, 1989) (motion for j.n.o.v. denied because "the jury could draw reasonable inferences from the evidence that a Fibreboard asbestos product was used in the vicinity of Dynes, that Dynes was exposed to such product for a significant time, and that his injuries would not have occurred solely as a result of exposure to the asbestos-containing products of [others].").

In summary, the testimony introduced in the instant case did not merely place Ehret pipecovering "somewhere" in a large facility, but rather placed it in the specific area (i.e., the boiler room) in which Rotondo worked. In addition, the evidence established that Rotondo worked in the boiler room of the *Monticello* at least 2 days a week for at least 3 to 4 months during the summer of 1942, and that the pipecoverers used the Ehret product fifty percent of the time. Even if Rotondo was not exposed to Ehret covering during most of the period that he worked in the boiler room, Dr. DuPont testified that mesothelioma is not dose-dependent and that relatively small amounts of asbestos can cause this condition.

Nor do we agree with Keene that plaintiff presented insufficient evidence from which a jury could infer that Rotondo had inhaled asbestos from Ehret covering. Souels testified that it would not be possible for people working around pipecoverers not to breathe the dust. Rotondo testified that the boiler room was unventilated, and that his clothes were covered with dust when he worked in the boiler room. Thus, although Dr. DuPont agreed with defendant that only air sampling would positively detect asbestos dust, a jury could properly infer that when covering containing asbestos is sawed and releases dust, that dust contains asbestos. We conclude that plaintiff has presented enough evidence to survive Keene's j.n.o.v. motion, that the trial court did not err in denying Keene's motions for a directed verdict or j.n.o.v., and that it did not abuse its discretion in denying Keene's motion for a new trial.

## V.

### *Conclusion*

For the reasons set forth, we will affirm the judgment of the district court.